```
           IN THE UNITED STATES DISTRICT COURT
            FOR THE SOUTHERN DISTRICT OF OHIO
                     EASTERN DIVISION


James E. Gossett, Jr.,        :

      Plaintiff,              :

   v.                         :   Case No. 2:13-cv-0106

Commissioner of Social        :   JUDGE GREGORY L. FROST
   Security,                      Magistrate Judge Kemp
                              :
      Defendant.
```

REPORT AND RECOMMENDATION

I. Introduction

Plaintiff, James E. Gossett, Jr., filed this action seeking review of a decision of the Commissioner of Social Security denying his applications for disability insurance benefits and supplemental security income. Those applications were filed on November 19, 2009 and alleged that Plaintiff became disabled on August 30, 2006.

After initial administrative denials of his applications, Plaintiff was given a videoconference hearing before an Administrative Law Judge on August 4, 2011. In a decision dated October 11, 2011, the ALJ denied benefits. That became the Commissioner's final decision on December 4, 2012, when the Appeals Council denied review.

After Plaintiff filed this case, the Commissioner filed the administrative record on April 15, 2013. Plaintiff filed his statement of specific errors on July 18, 2013. The Commissioner filed a response on November 22, 2013. No reply brief was filed, and the case is now ready to decide.

II. Plaintiff's Testimony at the Administrative Hearing

Plaintiff, who was 49 years old at the time of the administrative hearing and is a high school graduate, testified

as follows.  His testimony appears at pages 31-69 of the administrative record.

Plaintiff testified that he needed to use a cane both indoors and outdoors due to problems with his back and legs.  He had pain in his right knee which had persisted for several years.  He held his cane in his right hand, and he was right-handed.  At the time of the hearing, he weighed almost 300 pounds.  He was able to drive but it was painful to do so.

The last job Plaintiff held was as a forklift driver for a trash disposal company.  He worked there for about two months.  He was forced to quit because he could not do the job physically.  He had prior forklift driver jobs for other employers, including a company called Container Management.  While working there, he hurt his back while unloading a steel drum.  That occurred in roughly 2005.  He had also driven a boom truck for a construction company.  He had been receiving workers' compensation based on the back injury.

Plaintiff said his worst problem was his back.  He had pain in his low back due to his injury and took several medications for it.  The medications did provide him with substantial relief.  He also was experiencing problems with his left elbow, which would swell five or six times per month, and he had frequent headaches.  On a daily basis, Plaintiff read the newspaper, watched television, walked a little in his neighborhood, and did a few household chores.  His wife did most of the housework.  He could lift five pounds comfortably and could walk for five or ten minutes.  He might be able to stand and walk for up to two hours in a workday, but not without his cane.  He could sit for half an hour. Usually, he napped at some point during the day.  Lifting his arms overhead was painful and he could not climb an entire flight of steps.  He experienced good days and bad days; on a bad day, he could not do anything but sit on the couch.

### III. The Medical Records

The medical records in this case are found beginning on page 246 of the administrative record. The pertinent records - those relating to Plaintiff's physical conditions which developed near or after his onset date and which are at issue in this case - can be summarized as follows.

On October 10, 2005, Plaintiff was seen by Dr. Bridger for a shoulder sprain which had occurred earlier that year at work. X-rays were negative for joint abnormalities or fracture but an MRI showed tendinosis. (Tr. 246-48).

Plaintiff was seen at the Grant Medical Center emergency room on April 22, 2007 complaining of back pain. His past medical history included both chronic back pain and hypertension. A back examination showed diffuse tenderness. The treatment noted showed that Plaintiff had received numerous prescriptions over the past year for both Vicodin and Tramadol. He was given two Vicodin at the emergency room, but not a prescription. He was told to follow up with his doctor. (Tr. 264-65).

A number of notes from doctor's office visits (apparently from Dr. McGriff's office) appear in the record beginning at page 291. The first of them is dated January 5, 2009. That note shows Plaintiff's diagnoses to be cervical spondylosis, contusion of back, protruding disc C6-C7, sprain of neck and sprain of shoulder/arm. All of the these conditions apparently arose from the 2005 work accident involving the steel drum. Plaintiff described his pain as an ache in his back, neck and left shoulder, aggravated by the cold. His symptoms occurred daily but were significantly relieved by medication. The most significant findings were increased pain in the lumbar spine, chronic muscle spasm and tenderness, and decreased range of motion in the lumbar spine. At the time of that visit, Plaintiff's medications included Vicodin, Soma, and Naprosyn.

Notes from subsequent visits spanning a period from February, 2009 through February, 2010 are very similar, although they also show that the pain was worsened by standing up or by activity; that at some visits, Plaintiff reported either that his medication was not helping or was not as effective as it had been; and that at least on one occasion (<u>see</u> Tr. 309) he said he was not having symptoms every day.  (Tr. 291-321).

    The next document in the medical record is the report of an independent medical examination done on December 14, 2009 by Dr. Gade-Pulido for the Bureau of Workers Compensation.  Her report lists the same conditions, which appear to be the conditions allowed for the workers compensation claim.  Plaintiff reported being treated by Dr. McGriff with various therapies, including medications, heat packs, traction, ultrasound and injections, all of which helped.  He told Dr. Gade-Pulido that he had continuing pain in his neck, back, and left shoulder and had headaches and occasional numbness as well.  His activity level varied with his back pain and prolonged sitting or standing affected his back, neck, shoulder and knee.  Dr. Gade-Pulido reviewed a number of records and conducted a physical examination.  The results of that examination showed that Plaintiff walked with a forward flexed posture and had difficulty with heel and toe walking.  The range of motion of both his cervical and lumbar spines was reduced, but he did have full range of motion of the left shoulder.  Tenderness was noted in both the cervical and lumbosacral areas and there was a moderate degree of muscle spasm.  His reflexes were normal and symmetrical and the bulk and tone of his muscles were normal.  Dr. Gade-Pulido concluded that Plaintiff had reached maximum medical improvement and that he could not return to his former employment due to its heavy labor demands.  She thought, however, that he was "capable fo a sedentary to light duty physical demand category of work."  (Tr.

322-25). A prior evaluation for BWC which had been done by Dr. Kearns on June 29, 2009, was fairly similar; Dr. Kearns thought Plaintiff could lift and carry up to twenty pounds frequently, could also twist and turn frequently, and could bend, reach below the knee, push, pull, and reach above the shoulders occasionally. (Tr. 514-17).

Dr. Thomas, a state agency reviewer, completed a physical residual functional capacity assessment form on April 9, 2010. She stated that Plaintiff could lift 20 pounds occasionally and ten pounds frequently, could stand and walk for up to six hours in a workday, could sit the same length of time, could occasionally climb ladders, ropes, or scaffolds, could occasionally stoop, crouch and crawl, and could frequently climb ramps and stairs. She also thought he was limited in his ability to reach in all directions, and, more specifically, "[w]ould be limited to occasional overhead reaching bilaterally." She explained in the narrative portions of her report that Plaintiff's "[a]mbulatory aid is not obligatory" and that there were inconsistencies in the way Plaintiff described his symptoms and limitations, making his statements only partially credible. She concurred with Dr. Gade-Pulido's views about Plaintiff's being capable of sedentary and light duty work. (Tr. 333-40). Dr. McCloud later reviewed this report and some additional records and affirmed Dr. Thomas's opinion. (Tr. 376).

Dr. McGriff signed a referral slip on May 3, 2010. He noted that Plaintiff was under his care as of that date and would "be unable to return to work/school." He noted that Plaintiff was "being treated for chronic pain on neck, back, shoulder, elbow, knee and is being seen 1 time a month ...." (Tr. 342). Additional office notes follow this report, showing treatment through June 1, 2010; they are not materially different from the earlier notes made by Dr. McGriff's office, nor much different

-5-

from an additional sequence of treatment notes from 2007, or a later sequence from 2011.  On July 27, 2009, Dr. McGriff had written a letter in connection with Plaintiff's workers compensation claim in which he described Plaintiff as "temporarily totally disabled."  (Tr. 518).

On February 4, 2010, Plaintiff was referred to a company called Medical Vocational Professionals, or MedVoPro, for a vocational rehabilitation evaluation.  He was interviewed the following day.  At the interview, he exhibited various pain behaviors.  He told the examiner he could stand for fifteen minutes, walk for ten minutes with a cane, sit for fifteen minutes, lift eight pounds, had limitations on the left side in reaching above shoulder level, handling and gripping, and that he could not kneel or bend.  A functional capacity evaluation was recommended to determine if there were jobs that he could do. (Tr. 506-13).

The final few records come, first, from the Pain Management Consortium of Ohio, where Plaintiff was evaluated on a one-time basis on May 26, 2011, and from the Dublin Pain Clinic.  The first of these records states that Plaintiff's physical exam on the date in question showed absent reflexes in both arms and legs and that the motor tone in Plaintiff's arms and legs was "not intact."  The same was true of hip abduction and adduction and sensation in the right and left legs.  Flexion of the lumbar spine was diminished and the range of motion of both the lumbar and cervical spines was decreased as well.  The most pain Plaintiff exhibited was in his lumbar spine, and that pain radiated into his left leg and caused some numbness in his toes. The examiner, Dr. Massau, suggested changing Plaintiff's medications, substituting Zanaflex for Soma and decreasing the dosage of percocet.  He also recommended weight loss.  (Tr. 578-79).  The Dublin Pain Clinic records date from 2012 and are

somewhat similar, with additional recommendations for physical therapy and a TENS unit.  Neither of these sets of records were before the ALJ but were submitted to the Appeals Council.  (Tr. 574-87).  That also appears to be true with respect to some of the later treatment notes from Dr. McGriff's office.

### IV.  The Vocational Testimony

A vocational expert, Ms. Srinivasen, also testified at the administrative hearing.  Her testimony begins at page 69 of the record.

Ms. Srinivasen characterized plaintiff's past work as falling into two general job descriptions, forklift operator and material handler.  The former job is medium and unskilled, and the latter is heavy and semiskilled.

Ms. Srinivasen was asked some questions about a hypothetical person who could perform a limited range of light work, being unable to climb ladders, ropes or scaffolds but who could occasionally climb stairs and ramps and could occasionally stoop, crouch, crawl and kneel.  That person also could not work around hazards like unprotected heights and dangerous machinery.  Finally, the person could only reach overhead occasionally with his left arm.  She responded that such a person could not do any of Plaintiff's past relevant work but could do jobs like mail clerk or motel cleaner.  Needing to use a cane would eliminate the cleaner job but not the mail clerk position, and such a person could also work as a stock clerk.

Ms. Srinivasen was then asked to assume that the person could lift and carry only ten pounds, could occasionally bend, reach below the knee, push, pull, and lift above shoulder level, could frequently twist and turn and was not limited in squatting, standing, walking or sitting.  Those limitations would not prevent the person from doing the mail clerk or stock clerk jobs.  However, if the person were off task for 15% of the time due to

pain or to miss two days of work per month on a regular and unscheduled basis, he or she could not work.  Finally, if the person could not use his or her dominant hand because it would be occupied holding a cane, that person could not do either of the jobs which Ms. Srinivaseni identified.

V.   The Administrative Law Judge's Decision

The Administrative Law Judge's decision appears at pages 12 through 22 of the administrative record.  The important findings in that decision are as follows.

The Administrative Law Judge found, first, that plaintiff met the insured requirements for disability benefits through September 30, 2011.  Next, plaintiff had not engaged in substantial gainful activity from his alleged onset date of August 30, 2006 through the date of the decision.  As far as plaintiff's impairments are concerned, the ALJ found that plaintiff had severe impairments including "obesity, protruding disc at C6-7 with cervical spondylosis, shoulder sprain, neck sprain, and back contusion." (Tr. 15).  The ALJ also found that these impairments did not, at any time, meet or equal the requirements of any section of the Listing of Impairments (20 C.F.R. Part 404, Subpart P, Appendix 1).

Moving to the next step of the sequential evaluation process, the ALJ found that plaintiff had the residual functional capacity to perform  light work with these limitations: he could never climb ladders, ropes or scaffolds, could occasionally climb ramps and stairs, stoop, crouch, crawl, and kneel, could frequently reach in all directions bilaterally but was limited to only occasional lifting overhead with his left arm, and could not work around hazards such as unprotected heights and dangerous moving machinery.  The ALJ found that, with these restrictions, plaintiff could not perform his past relevant work, but could perform certain jobs identified by the vocational expert (mail

-8-

clerk and housekeeper/cleaner), and that such jobs existed in significant numbers in the state and national economies. Consequently, the ALJ concluded that plaintiff was not entitled to benefits.

      VI.   Plaintiff's Statement of Specific Errors

In his statement of specific errors, Plaintiff raises three issues.  He argues that (1) the ALJ improperly rejected the opinions of the treating doctors (Drs. Kearns, McGriff, and Gade-Pulido, of whom only Dr. McGriff was actually a treating source) and substituted his own opinion for theirs; (2) the ALJ posed an improper hypothetical question to the vocational expert concerning Plaintiff's ability to reach overhead bilaterally; and (3) the ALJ did not do a proper credibility assessment.  The Court generally reviews the administrative decision of a Social Security ALJ under this legal standard:

Standard of Review.  Under the provisions of 42 U.S.C. Section 405(g), "[t]he findings of the Secretary [now the Commissioner] as to any fact, if supported by substantial evidence, shall be conclusive. . . ."  Substantial evidence is "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion'" Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consolidated Edison Company v. NLRB, 305 U.S. 197, 229 (1938)).  It is "'more than a mere scintilla.'" Id.  LeMaster v. Weinberger, 533 F.2d 337, 339 (6th Cir. 1976).  The Commissioner's findings of fact must be based upon the record as a whole.  Harris v. Heckler, 756 F.2d 431, 435 (6th Cir. 1985); Houston v. Secretary, 736 F.2d 365, 366 (6th Cir. 1984); Fraley v. Secretary, 733 F.2d 437, 439-440 (6th Cir. 1984).  In determining whether the Commissioner's decision is supported by substantial evidence, the Court must "'take into account whatever in the record fairly detracts from its weight.'" Beavers v. Secretary of Health, Education and Welfare, 577 F.2d 383, 387 (6th Cir. 1978) (quoting Universal Camera Corp. v. NLRB,

340 U.S. 474, 488 (1951)); Wages v. Secretary of Health and Human Services, 755 F.2d 495, 497 (6th Cir. 1985). Even if this Court would reach contrary conclusions of fact, the Commissioner's decision must be affirmed so long as that determination is supported by substantial evidence. Kinsella v. Schweiker, 708 F.2d 1058, 1059 (6th Cir. 1983).

### A. Treating Source Opinion Evidence

The first issue raised in plaintiff's statement of errors relates to the ALJ's evaluation of opinions expressed by either treating or examining physicians. Any discussion about whether an ALJ properly evaluated the opinion of a treating source must begin with the ALJ's decision on that issue. Since Dr. McGriff was the only treating source who rendered any type of opinion about Plaintiff's residual functional capacity, the Court will first examine the way in which the ALJ analyzed Dr. McGriff's opinion.

The ALJ did not spend much time with that opinion. He did not explicitly determine that it was not "well-supported by medically acceptable clinical and laboratory diagnostic techniques" or that it was "not inconsistent with the other substantial evidence in [Plaintiff's] case record" - the inquiry required by 20 C.F.R. §404.1527(c)(2). See also Gayheart v. Comm'r of Social Security, 710 F.3d 365 (6th Cir. 2012). Rather, he dismissed it as not being a medical opinion, but a statement relating to an administrative matter reserved to the Commissioner for decision. Thus, the ALJ concluded that such opinions "can never be entitled to controlling weight ...." (Tr. 20). He used the same rationale for not giving any weight to Dr. Kearns' statement about Plaintiff's being unable to return to his past work; he did give some weight to Dr. Gade-Pulido's opinion, but discounted it due to her failure to "buil[d] an adequate bridge between actual medical findings and work related limitations," even though her ultimate conclusion was similar to the residual

-10-

functional capacity finding which the ALJ arrived at. Id. Finally, he looked separately at Dr. Kearns' findings as to Plaintiff's limitations, gave them some weight, but ultimately discounted them because they seemed inconsistent with some of Dr. Kearns' own findings. Id.

The most significant problem with Plaintiff's first assignment of error is that the record clearly shows that neither Dr. Kearns nor Dr. Gade-Pulido were treating physicians. Although the ALJ and both parties appear to regard him as a treating source, Dr. Kearns clearly stated in his June 29, 2009 opinion letter that "[i]t was explained at the start of the evaluation that this is for a one-time evaluation only and not to establish a treating physician/patient relationship." (Tr. 514). The record does not appear to contain any treatment notes from Dr. Kearns or from The Ohio State University Medical Center, where Dr. Kearns practiced. There is simply no basis for concluding that he was a treating physician.

The ALJ does not have appear to have considered Dr. Gade-Pulido to be a treating source; the administrative decision describes only Drs. McGriff and Kearns in that way. Thus, despite the fact that both parties have argued the issue about her opinion as if she were a treating source, she clearly was not. Like Dr. Kearns, she did a one-time evaluation for the BWC and she even titled her report an "Independent Medical Evaluation." (Tr. 322). The Court simply sees no basis for the parties' conclusion that she was a treating source.

That being said, the question raised by Plaintiff's statement of errors, at least as it relates to Dr. McGriff, is whether the ALJ gave good reasons for assigning his opinion no weight, and, if so, whether those reasons are supported by the record. See Wilson v. Comm'r of Social Security, 378 F.3d 541, 544 (6th Cir. 2004). In order for the "treating physician" rule to apply, however, the treating physician must have expressed a

"medical opinion."  See 20 C.F.R. §404.1527(c)(2); see also Dillard v. Comm'r of Social Security, 2011 WL 7144896, *6 (S.D. Ohio Nov. 29, 2011) (noting, and quoting then-section 404.1527(d)(2), that "any statement from an acceptable source that 'reflect[s] judgments about the nature and severity of [an] impairment' would seem to fall into the defined category of medical opinions"), adopted and affirmed 2012 WL 367962 (S.D. Ohio Feb. 3, 2012).  If the treating physician merely states, without more, that a claimant is disabled, that opinion is not given the same consideration; 20 C.F.R. §404.1527(d)(1) clearly states that opinions "on some issues," including whether someone is disabled, are not "medical opinions."  See also Bass v. McMahon, 499 F.3d 506, 511 (6th Cir. 2007).  On the other hand, such an opinion cannot simply be tossed aside without comment.  Rather, the ALJ must explain what consideration was given that opinion.  Id., citing SSR96-5: Policy Interpretation Ruling Titles II and XVI: Medical Source Opinions on Issues Reserved to the Commissioner, 61 Fed.Reg. at 34474.

 Here, it seems clear that Dr. McGriff never expressed any medical opinions about Plaintiff's physical capabilities beyond the statement that Plaintiff could not return to work – an opinion that the ALJ agreed with – and an opinion that he was temporarily totally disabled, which is a state law standard applicable to workers compensation matters and clearly not a medical opinion within the meaning of §404.1527(c).  Plaintiff's memorandum does not address this issue at all.  The Court finds that there was no opinion about either physical limitations or disability for social security purposes from Dr. McGriff, and therefore nothing for the ALJ to consider.  Even if that is not so, the ALJ did explain why he did not find Plaintiff totally disabled, and that is enough of an explanation to satisfy whatever articulation requirement is imposed by SSR 96-5.

 Since neither Dr. Kearns nor Dr. Gade-Pulido was a treating

source, the ALJ was under no obligation to follow the treating physician rule with respect to their opinions. The ALJ did explain why he agreed with substantial parts of both evaluations, and elsewhere in the administrative decision he reviewed the medical evidence extensively and explained why he gave the most weight to the opinion of Dr. Thomas. An ALJ is entitled to resolve conflicts in the medical evidence, especially between opinions of non-treating medical sources, and the Court will rarely reverse a case just because the ALJ credits one non-treating physician's views over the other (although, of course, substantial evidence must still support the ALJ's decision). See, e.g, Jones v. Comm'r of Social Security, 2012 WL 5378850, *5 (S.D. Ohio Oct. 30, 2012) ("An ALJ is permitted to make such resolutions of conflicting evidence, and there is no specific requirement that this type of decision be set forth in the same type of detail required when rejecting the opinion of a treating source"), adopted and affirmed 2013 WL 556208 (S.D. Ohio Feb. 12, 2013). Again, apparently not recognizing that this, rather than the treating physician rule, is the issue with respect to the ALJ's treatment of the opinions of Drs. Kearns and Gade-Pulido, Plaintiff has offered no argument directly on point. The Court finds nothing in his first assignment of error to justify reversal or remand.

### B.  The Hypothetical Question

Plaintiff's second assignment of error is directed to the hypothetical question posed to the vocational expert concerning Plaintiff's ability to do a limited range of light work activity. In particular, he argues that the limitation imposed on overhead reaching - with his left arm only - was not supported by the evidence because even Dr. Thomas, whose opinion the ALJ assigned great weight to, thought there was a bilateral restriction on overhead reaching. The balance of the argument on this point appears to be nothing more than a description of the questions

-13-

which Plaintiff's counsel posed to the vocational expert and the answers she gave, so the Court will limit its discussion to the question of whether substantial evidence supported the ALJ's finding that Plaintiff was limited in his ability to reach overhead with his left arm, but not bilaterally.

The Commissioner's memorandum appears to accept Plaintiff's claim of an inconsistency between Dr. Thomas' opinion and the first hypothetical question asked by the ALJ, and defends his decision on other grounds. However, even though Dr. Thomas expressed that view, Plaintiff himself told the vocational evaluator on February 5, 2010 that his overhead reaching problem was limited to his left arm. (Tr. 511). Also, the only documented shoulder injury was to the left shoulder. Therefore, the RFC developed by the ALJ is consistent with and supported by the record as a whole. Even if it were not, the Court agrees with the Commissioner that the jobs identified by the vocational expert at the light level - the ones which the ALJ found plaintiff could do - could, as the vocational expert testified, be done by someone who could only "occasionally lift above shoulder level." (Tr. 74). Thus, there is also no error in the way the ALJ relied on the vocational expert's answers to the various hypothetical questions posed.

## C. Credibility

Plaintiff's final argument is that the ALJ did not properly assess his credibility. The only specific points he raises in support of that argument are that the ALJ should have given more weight to his work history and should have found that the pain medication which Plaintiff takes affected his ability to work. He also implies that the ALJ's reliance on the absence of objective medical evidence to support Plaintiff's claim of disabling low back pain was erroneous.

It is true, as Plaintiff argues, that a social security ALJ is not permitted to reject allegations of disabling symptoms,

including pain, solely because objective medical evidence is lacking.  Rather, the ALJ must consider other evidence, including the claimant's daily activities, the duration, frequency, and intensity of the symptoms, precipitating and aggravating factors, medication (including side effects), treatment or therapy, and any other pertinent factors.  20 C.F.R. §404.1529(c)(3).  Although the ALJ is given wide latitude to make determinations about a claimant's credibility, the ALJ is still required to provide an explanation of the reasons why a claimant is not considered to be entirely credible, and the Court may overturn the ALJ's credibility determination if the reasons given do not have substantial support in the record.  See, e.g. Felisky v. Bowen, 35 F.3d 1027 (6th Cir. 1994).

   The ALJ found Plaintiff's testimony not credible to the extent that it conflicted with the ALJ's residual functional capacity finding.  In doing so, the ALJ cited to Plaintiff's general demeanor as raising a question as to his credibility; to the absence of any type of testing or treatment which would be expected for a serious low back condition, coupled with the fact that the diagnosis of that condition appeared to be a back contusion; to the Plaintiff's testimony that he had been able to operate a forklift for several months after his alleged onset date; and to evidence that Plaintiff's pain is, at times, well-controlled by medication.  Although the ALJ did not specifically mention either Plaintiff's work history or the side effects of his medications, it is worthwhile to note that no doctor suggested that Plaintiff was disabled (or, for that matter, impaired) by medication side-effects.  Further, there is no authority (and Plaintiff has cited none) holding that an ALJ must always state explicitly that a claimant's favorable work history has been taken into account.  The key ruling governing an ALJ's evaluation of a claimant's credibility, SSR 96-7p, lists seven factors which go into that determination, and the fact that the

-15-

claimant had a good work history is not one of them.  Given that the Court is "limited to evaluating whether or not the ALJ's explanations for partially discrediting [the claimant] are reasonable and supported by substantial evidence in the record," Jones v. Comm'r of Social Security, 336 F.3d 469, 476 (6th Cir. 2003), and that "[c]laimants challenging the ALJ's credibility findings face an uphill battle," Daniels v. Comm'r of Social Security, 152 Fed. Appx. 485, 488 (6th Cir. Oct. 24, 2005), this Court cannot say that the deficiencies which Plaintiff alleges in the ALJ's credibility assessment are sufficiently weighty to justify reversal or remand.  Consequently, the Court finds each of Plaintiff's three claims of error to be without merit.

### VII.   Recommended Decision

Based on the above discussion, it is recommended that the plaintiff's statement of errors be overruled and that judgment be entered in favor of the defendant Commissioner of Social Security.

### VIII.   Procedure on Objections

If any party objects to this Report and Recommendation, that party may, within fourteen (14) days of the date of this Report, file and serve on all parties written objections to those specific proposed findings or recommendations to which objection is made, together with supporting authority for the objection(s). A judge of this Court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made.  Upon proper objections, a judge of this Court may accept, reject, or modify, in whole or in part, the findings or recommendations made herein, may receive further evidence or may recommit this matter to the magistrate judge with instructions.  28 U.S.C. §636(b)(1).

The parties are specifically advised that failure to object to the Report and Recommendation will result in a waiver of the right to have the district judge review the

Report and Recommendation de novo, and also operates as a waiver of the right to appeal the decision of the District Court adopting the Report and Recommendation.  See Thomas v. Arn, 474 U.S. 140 (1985); United States v. Walters, 638 F.2d 947 (6th Cir. 1981).

        /s/ Terence P. Kemp
        United States Magistrate Judge